**GLAXO WARNER–LAMBERT OTC G.P., Plaintiff,**

v.

**JOHNSON & JOHNSON MERCK CONSUMER PHARMACEU-TICALS CO., Defendant.**

**No. 96 Civ. 4624 (DAB).**

United States District Court, S.D. New York.

July 22, 1996.

Davis Polk & Wardwell, New York City; Daniel F. Kolb, James P. Rouhandeh, of counsel, and Wiley, Rein & Fielding, Washington, DC; Hugh Latimer, of counsel, for plaintiff.

Patterson, Belknap, Webb & Tyler, L.L.P., New York City; Steven A. Zalesin, Jennifer L. Pariser, of counsel, and Johnson & Johnson by Kathryn A. Meisel, New Brunswick, NJ, for defendant.

BATTS, District Judge.

THE COURT: This is the opinion of the Court.

At the outset, I want to state that I have been particularly impressed by the ingenuity, intelligence and tenacity of counsel for both parties in this action before me. It has been clear to me that the intensity displayed on the phone, and in hearings over the last several weeks comes from the caliber of counsel as well as the fervor with which they advanced their clients' positions. The same is true of the witnesses called by both sides.

Unfortunately, these are not the standards or considerations that I must apply in determining whether or not to issue a preliminary injunction in an alleged false advertising claim under the Lanham Act.

A party seeking preliminary injunctive relief must show (a) that it will suffer irreparable harm if relief is denied, and (b) either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to make them fair ground for litigation, and (c) a balance of the hardships tipping decidedly in plaintiff's favor. *Castrol, Inc. v. Quaker State Corporation,* 977 F.2d 57, 62 (2d Cir.1992). Irreparable harm is presumed when the plaintiff can demonstrate a likelihood of success in showing defendant's advertisement was literally false. *Id.*

Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), provides that, "Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false

or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion or to cause a mistake ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

■ In order to recover damages or to obtain equitable relief, a plaintiff must demonstrate either (1) the challenged advertisement is literally false, or (2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers. *Johnson & Johnson–Merck Consumer Pharmaceuticals Company v. Smithkline Beecham Corporation,* 960 F.2d 294, 297 (2d Cir. 1992). *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991).

■ Turning to the duration claim, the ad here states, in its entirety, "If you're considering Zantac 75 for heartburn, consider this first, Pepcid AC. Both Pepcid AC and Zantac 75 can be taken after dinner to relieve heartburn. And 12 hours later both are still controlling acid so you can sleep. But read the labels. Here's the difference, you can take Pepcid AC to stop heartburn before it starts. Zantac 75 can't claim that. Before or after, you can be heartburn free with Pepcid AC."

■ Plaintiff argues that defendant's claim in the contested advertisement—"12 hours later both are still controlling acid so you can sleep," is literally false. "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public,'" *McNeil,* 938 F.2d at 1549, quoting *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir. 1982). To show falsity one must do more than show the tests that support the claim are unpersuasive. *McNeil,* 938 F.2d at 1549.

Furthermore, the standard the Court will apply depends on the language of the advertisement. When the ad relies on scientific studies, whether implicitly by making a claim while showing a graph or diagram, or explic-itly, by stating, for example, "that studies show," the standard to apply is stricter.

■ To prove a claim literally false, that mentions scientific evidence, the plaintiff bears the burden of showing that "the tests referred to ... [are] not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited," again citing *McNeil,* 938 F.2d at 1549 (quoting *Procter & Gamble Co. v. Chesebrough–Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984)); see also *Castrol,* 977 F.2d at 62. When no mention of scientific studies is made in an advertisement, then falsity is proven upon adducing evidence that affirmatively shows the claim to be false. *Castrol,* 977 F.2d at 62. This second standard is the plaintiff's burden. Plaintiff would argue that Dr. Ross testified that any statement made in an advertisement, claiming equivalency, represents to a consumer that there are tests to support the statement. The Court finds that this attempt to apply the less stringent standard to the facts here fails. The less stringent standard is meant to apply to those commercials that mention "studies" or "tests," or make statements while pointing to graphs or similar items. This ad had none of those implications. (Tr. at 4–6; 7/18/96) Although the consumer survey offered by the plaintiff was offered for the prevention claim only, it is curious to note that, at least one respondent, No. 0615, stated in response to the question about the main ideas of the ad, "Household mother commending Pepcid AC, rather than a doctor."

Defendant does not have the burden of proving that its advertisement is true.

Here, plaintiff claims that the advertisement is literally false because Pepcid AC cannot control acid for 12 hours. However, the Court finds that the advertisement does not claim that the medicine controls acid for 12 hours, rather, the ad claims that Pepcid AC is controlling acid at the twelfth hour, or twelve hours after dosage. Indeed, plaintiffs cannot affirmatively prove that Pepcid AC does not control acid twelve hours after dosage. In fact, there is evidence before the

Court that shows that Pepcid AC does control acid twelve hours after dosage.

Six studies have been advanced to prove the claims at issue. Four of those studies involve Pepcid AC. However, only two of the four are nighttime studies. The ad here states that Pepcid AC, "can be taken after dinner to relieve heartburn. And 12 hours later both are still controlling acid so you can sleep." The advertisement refers to the nighttime relief of heartburn. The Court will first address, therefore, the nighttime studies.

Defendant's Exhibit study 066, evidenced in Plaintiff's Trial Exhibits 31 and 32, and J & J Merck's study 076, evidenced in Plaintiff's 35 and 35.1, are nighttime studies. (Tr. at 67, 7/18/96.) In each, it is shown that Pepcid AC controls acid to a statistically significant degree, a p-value that is less than 0.05, 12 hours after dosage. (Tr. at 45, 7/18/96.) Plaintiff's expert, Professor Charles A. Rohde, a biostatistician, agrees. Referring to study 066, Professor Rohde states, "we had acid duration from one hour post-dosing to twelve hours post-dosing." (Tr. at 59, 7/18/96.) Referring to the 076 study, Professor Rohde states, "we still see an effect . . . at 12 hours post-dose." (Tr. at 68, 7/18/96.) Later in the testimony, the Court asks, "It will control acid 12 hours after dosage?" Professor Rohde responds, "That's correct . . . In fact, we have seen that on the charts. I don't think that's debatable." (Tr. at 96, 7/18/96.) ·Therefore, the Court finds that the evidence supports the claim that 12 hours after dosage both Pepcid AC and Zantac 75 are controlling acid.

J & J Merck's study 087, evidenced in Plaintiff's Trial Exhibits 30 and 30.1, and Glaxo Warner's study 1003, evidenced in Plaintiff's Exhibit 37, are daytime studies. Nevertheless, study 1003 also establishes that Pepcid AC controls acid 12 hours after dosage. That is Pl.'s Ex. 37 at GW00259; and also I think independently in the evidence as Defendant's Exhibit G–2.

This claim, therefore, is literally true. Had the plaintiff advanced evidence that consumers were misled and took this statement to mean that both Zantac 75 and Pepcid AC last for the same period of time, a claim plaintiff would argue is false, then perhaps plaintiff would have prevailed on this point. However, plaintiff has failed to come forward with any evidence to support consumer confusion on this issue. Hence, plaintiff, failing to meet its burden, is unlikely to succeed on the merits of this claim, and accordingly has not proven irreparable harm.

■ Turning to the heartburn prevention claim, plaintiff's second argument involves the advertisement's claim that Zantac 75 cannot claim that it prevents heartburn. Specifically, the ad states, "But read the labels. Here's the difference, you can take Pepcid AC to stop heartburn before it starts. Zantac 75 can't claim that." The Court finds that these statements are literally true.

It is undisputed that the plaintiff has not applied for, nor received, approval from the FDA to use ranitidine in its over-the-counter dosage, Zantac 75, for prevention of heartburn, they do currently have approval for use to relieve heartburn. Naturally, therefore, their labeling of the product does not include use of the product for prevention of heartburn. Defendant's Exhibits V and W. The labeling and approved use of defendant's product, Pepcid AC, does indicate both prevention and relief of heartburn, as they have received approval from the FDA to claim both. Defendant's Exhibit X.

During plaintiff's attorney's response to defendant attorney's arguments at the close of plaintiff's evidence, he stated, accurately, that the FDA does not have jurisdiction over advertising. Rather, the FTC and the courts patrol this area. However, the FDA has jurisdiction over approval for uses of medications and labeling of medications.

The difficulty with the distinction between labeling and advertising is that the very ad in question directs the consumer to "read the labels" and discover from the labels that prevention of heartburn is not a use indicated on Zantac 75, while it is a use indicated on Pepcid AC. Plaintiff does not claim otherwise—that is the labeling that is on its product, it can put on no other, absent FDA approval.

It would seem, then, that the plaintiff would have the Court hold that, what seems to be a fair advertising advantage, that is, differences in claims in the labeling based on the status of the products before the FDA, is instead an unfair advertising practice. This the Court is not prepared to do, especially under the standards that the plaintiff must meet to prevail on preliminary injunction. To do otherwise would have the Court equalize the products in the minds of the consumer in the claims they can make on their labels regarding prevention of heartburn, and thus eliminate the need for plaintiff to obtain FDA approval for labeling regarding heartburn prevention and to erase defendant's competitive advertising edge.

The advertisement on its face directs the consumers to read the labels and compare them. If they do, they would come to the same conclusion that Faith Daniels does in the ad, and as plaintiff's expert Dr. Ross finally acknowledged he would as well. (Tr. at 33–41, 7/18/96.)

Plaintiff must therefore show that the claim, although literally true, tends to mislead or confuse the consumers. *Johnson*, 960 F.2d at 297. This question is not to be determined by the Court, instead the Court asks, "What does the person to whom the advertisement is addressed find to be the message?" *Id.* (Quoting *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 166 (2d Cir.1978).)

■ This claim is usually supported by consumer surveys. First, the Court determines, by evaluating the consumer surveys, what message was conveyed to the public and that a substantial number of these consumers hold the false belief, *Johnson*, 960 F.2d at 298. "Once the meaning of the target audience has been determined, the court, as the finder of fact, must then judge whether the evidence establishes that they were likely to be misled." *Id.* (Quoting *Nikkal Indus. v. Salton, Inc.*, 735 F.Supp. 1227, 1235 (S.D.N.Y.1990).) In determining this, the court may consider other factors such as commercial context, the defendant's prior advertising history, and the sophistication of the audience.

■ The consumer survey that Dr. Ross developed and supervised sought to discern consumer understanding of the challenged advertisement after viewing it. Dr. Ross admitted that he would classify a respondent as "confused," if a respondent, either from viewing the test commercial or from reading Zantac 75's label, stated that Zantac 75 did not claim to prevent heartburn, or that, by omission, it could not prevent heartburn. Dr. Ross justified this classification because he himself was aware of one pooled, statistically significant study that showed that Zantac 75 could prevent heartburn. Using this highly restricted information, he concluded that consumers who read labels as the challenged ad tells them to do, were "confused" if they believed that Zantac 75 could not prevent heartburn or could not claim to prevent heartburn. (Tr. at 39; 7/18/96.) However, the Court finds that to use the pooled study as the basis for finding that a direction in an advertisement to read plaintiff's product's label is confusing to the consumer is not supportable, either on the facts in this case, or on the law. Hence, the Court finds that the premise of the consumer survey is faulty and does not support a finding that consumers were misled. Not only is the defendant's advertisement literally true; it is actually true.

Furthermore, even when looking at the study, Dr. Ross found that 77 people were misled because they took away the misimpression that Zantac 75 cannot prevent heartburn. However, if a consumer does as the commercial directs, that is, reads the labels, the consumer who believes that Zantac 75 could not prevent heartburn would not be incorrect.

As the Court has now found that the plaintiff has shown neither a likelihood of success on the merits nor sufficiently serious questions going to the merits to make them fair ground for litigation, and hence no irreparable harm, there is no reason to reach the balance of hardship factor.

I will point out, despite the ruling here, that the Court is troubled by the use by the defendant of the ruling by Judge Baer, in matters before that court where the question of onset was pivotal to the decisions reached

by that court. I, by my ruling here, have found that onset is not a factor raised by the ad, and therefore has no bearing on my opinion here. However, I would advise the defendants that they have very cleverly, and therefore successfully, crafted an ad that avoids the problems set forth by Judge Baer's opinion, in my opinion, and that they should be very careful not to go any further in terms of using that opinion inappropriately or offensively, and indeed if they do intend to do so, that they expect to completely and fully abide by it themselves whether or not they are required to. Don't shake it if you're not going to use it.

Conclusion: Plaintiff, having failed to meet its burden, its preliminarily injunction is denied.

THE COURT: This matter is adjourned.